# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3723

_____

| | | |
|---|---|---|
| Heartland Academy Community Church, a Missouri not-for-profit corporation; CNS International Ministries, Inc., a Missouri not-for-profit corporation; Michael Bounds; Catherine Brown; James Crary; Cheryl Crary; Vicki Sowle; Brad Hampton; Terry Hans; Katherine Hans; Timothy Hans; Leigha Lawson; Toni Lewis; Toniece Sims; Diane Mamell; Nicholas Martinez; Susan McCoy; Chelsea Grinnall; Douglas O'Neill; Julie Roberts-Cole; Karen Roberts Torress, | * * * * * * * * * * * * * * * * * | Appeal from the United States District Court for the Eastern District of Missouri. |
| Plaintiffs/Appellees, | * * | |
| Elyese Anderson; Russell Ayers; Cody Ayers; Michael J. Armstrong; Mary Alvesteffer; Jovani Bajana; Gordon Bold; Norma Bold; Christina Bold; Robert Bounds; Nancy Bounds; Jay Braun; Joseph Braun; James Brownfield; David Christensen; Becky Christensen; Jenna Christensen; Courtney Collins; Samantha Crary; Tyler Davis; Anthony Franklin; Catherine Franklin; Moriah Garza; Martha Hampton; Carolyn Hildebrand; Nicole Ward; Shawn Jarnigan; Tom Jarnigan; Donnie Johns; Carolyn Johns; | * * * * * * * * * * * * * * * * * | |

Jonathan Johns; Jesse Mamell;                *
Jennifer Martinez; Nicole Martinez;          *
Paula McKinney; Richard Pollitt;             *
Susan Pollitt; Jane White,                   *
                                             *
                     Plaintiffs,             *
                                             *
          v.                                 *
                                             *
Michael Waddle, in his individual            *
and official capacities; Jeff Hall, in       *
his individual and official capacities;      *
Cindy Ayers, in her individual and           *
official capacities; Dana Martin, in         *
her individual and official capacities;      *
Denise Cross, in her individual and          *
official capacities; Jerrie Jacobs-          *
Kenner, in her individual and official       *
capacities; Christine White, in her          *
individual and official capacities;          *
Donna Rohrbach, in her individual            *
and official capacities; Pam                 *
McGowan, in her individual and               *
official capacities; James Harrison, in      *
his individual and official capacities;      *
Mac Abernathy, in his individual and         *
official capacities; Richard                 *
Engelhardt, in his individual and            *
official capacities,                         *
                                             *
                     Defendants/Appellants.  *

_____

Submitted: September 21, 2009
        Filed:  February 8, 2010(Corrected: 2/24/2010)
_____

-2-

Before MURPHY, JOHN R. GIBSON, and RILEY, Circuit Judges.
_____

RILEY, Circuit Judge.

This interlocutory appeal is the latest battle in a nearly decade-old conflict between Heartland Christian Academy (HCA) and the State of Missouri. The two not-for-profit corporations that own and operate HCA, Heartland Academy Community Church (HACC) and CNS International Ministries, Inc. (CNS), six former HCA students (Students), and thirteen parents of former HCA students (Parents) (collectively, Heartland) are suing twelve Missouri juvenile officials (Officials) under 42 U.S.C. § 1983.[1] Heartland alleges the Officials conspired to raid HCA's campus and seize scores of its students in 2001, in violation of the United States Constitution. The Officials maintain they are entitled to qualified immunity, but the district court[2] denied their motions for summary judgment. To the extent we have jurisdiction over the Officials' interlocutory appeal, we affirm.

---

[1]The Students are Michael Bounds, Timothy Hans, Leigha Lawson, Toniece Sims, Chelsea Grinnall, and Karen Roberts Torress. The Parents are James and Cheryl Crary, Terry and Katherine Hans, Toni Lewis, Nicholas Martinez, Susan McCoy, Julie Roberts-Cole, Catherine Brown, Vicki Sowle, Brad Hampton, Diane Mamell, and Douglas O'Neill. The Officials are Michael Waddle, Jeff Hall, Cindy Ayers, Dana Martin, Denise Cross, Jerrie Jacobs-Kenner, Christine White, Donna Rohrbach, Pam McGowan, James Harrison, Mac Abernathy, and Richard Engelhardt. All of the remaining persons in the caption, listed as "Plaintiffs," are former plaintiffs who either abandoned their claims in the district court or did not attempt to cross-appeal an adverse grant of summary judgment. We have amended the caption to reflect the proper parties to this appeal.

[2]The Honorable Henry Edward Autrey, United States District Judge for the Eastern District of Missouri.

# I.    BACKGROUND

## A.    Allegations Against the Officials

Viewed in the light most favorable to Heartland, see, e.g., Brown v. City of Golden Valley, 574 F.3d 491, 495-96 (8th Cir. 2009), the facts[3] are these:

The Officials participated in a conspiracy to harass and intimidate HCA, a Christian faith-based boarding school in northeastern Missouri. HCA educates and provides social services to children with behavioral and substance abuse problems. As of 2001, approximately 120 of HCA's 220 students lived on HCA's campus.

Two of the conspiracy's more prominent members were Chief Juvenile Officers Michael Waddle (Waddle) and Cindy Ayers (Ayers). Waddle, the conspiracy's ringleader, disliked HCA because (1) HCA was unlicensed (legally), (2) Waddle disagreed with HACC's teachings, and (3) Waddle believed HCA had not acted "very Christ-like." Ayers complained HCA was "growing too fast," and expressed the view that "there [were] people everywhere at [HCA], including children from foreign countries," and Missouri should slow or "put a stop" to HCA.

The charged conspiracy reached its nadir on October 30, 2001, when juvenile authorities and armed law enforcement officers, 30 total, arrived at HCA's campus and removed 115 of its students. The Officials did not provide any notice to Heartland of the removal until the last possible moment. Waddle and Ayers procured ex parte orders from local juvenile court judges to remove HCA's students. Waddle and Ayers used false misrepresentations to obtain the ex parte removal orders. The juvenile court judges issued the ex parte orders under the false impressions (1) all HCA students were in imminent danger of physical harm, (2) HCA was unwilling to

---

[3]For purposes of summary judgment and this appeal, the Officials do not dispute Heartland's statement of facts.

cooperate with the relevant juvenile authorities, and (3) no lesser alternative short of a mass removal was available to ensure the students' safety.

The ex parte orders were rife with error, because Waddle and Ayers knowingly presented the juvenile court judges with stale information about HCA's student body. As a direct consequence, those conducting the raid lacked ex parte orders for dozens of the children they removed. Yet they possessed ex parte orders for approximately forty children who no longer lived at HCA and four adults over whom the juvenile judges lacked jurisdiction.

Members of the conspiracy, together with others, detained the HCA students at local facilities until the students' parents retrieved them. When the parents arrived at the detention facilities—sometimes several days after the raid and from far-flung locations—the parents received stern letters advising the parents to keep their children away from HCA. The letters suggested the return of a child to HCA might result in the parents' loss of custody of their children or referral to law enforcement authorities.

The juvenile court judges scheduled post-removal detention hearings, but Waddle and Ayers preemptively moved to dismiss the underlying juvenile court cases as soon as the parents picked up their children. All cases were eventually dismissed, the judges never held any hearings, and the propriety of the raid was never litigated in juvenile court.

After the hearings were cancelled and the juvenile court cases dismissed, the Officials tried to cover up their misdeeds. They spread false and misleading information to the press and politicians alike. For example, Dana Martin (Martin), Director of the Missouri Department of Social Services, sent a letter to a Missouri state representative. In the letter, Martin falsely stated (1) the Missouri Division of Family Services (DFS) had received "numerous reports of child abuse and neglect [at HCA] dating back to 1998"; (2) DFS "made many attempts to resolve concerns with

-5-

[HCA] from March 2001 until the eventual removal of the children in October";
(3) no DFS personnel participated in the mass removal; and (4) a HCA staff member
had pled guilty to beating a child.

### B.     Legal Wrangling
#### 1.     Equitable Relief Case

In July 2001, months before the raid, HACC and CNS (collectively, Heartland
Corporations) filed a lawsuit (Equitable Relief Case) in the district court[4] against
Waddle and others.  Heartland Corporations asked for a permanent injunction to stem
an alleged campaign to harass and intimidate HCA, its employees and students and
their families.

Shortly after the raid, Heartland Corporations asked the district court for
emergency equitable relief to prevent Waddle from carrying out another raid absent
certain safeguards, including notice and hearings for affected parties.  The district
court issued a preliminary injunction.  Among other things, the court forbade Waddle
"from seeking or participating in any pre-hearing removal of all boarding children
from HCA unless all boarding children at HCA are directly involved in the underlying
facts that serve as the basis for such removal."  We affirmed the preliminary
injunction in 2003.  See generally Heartland Acad. Cmty. Church v. Waddle, 335 F.3d
684, 688, 691 (8th Cir. 2003).

The district court then presided over a bench trial on Heartland Corporations'
request for a permanent injunction against Waddle and Ayers.[5]  The district court held
(1) Waddle and Ayers violated and conspired to violate Heartland Corporations'
Fourth Amendment rights to be free from unreasonable seizures; (2) Waddle and

---

[4]The Honorable E. Richard Webber, United States District Judge for the Eastern
District of Missouri, presided over the Equitable Relief Case.

[5]Heartland Corporations added Ayers as a defendant after the raid.

-6-

Ayers violated Heartland Corporations' Fourteenth Amendment procedural and substantive due process rights; and (3) Waddle violated Heartland Corporations' First Amendment rights to free association. The district court permanently enjoined Waddle from "caus[ing] or attempt[ing] to cause the pre-notice or pre-hearing removal of or tak[ing] into protective custody . . . children from [HCA] without reasonable cause to believe that each child for whom protective custody or removal is sought is in imminent danger[.]" The district court found Waddle "appear[ed] ready and willing to once again remove the children from [HCA]." The court declined to enjoin Ayers, however, because the court found she "expresse[d] no intention of engaging in such behavior in the future[.]" We affirmed the permanent injunction in 2005. See generally Heartland Acad. Cmty. Church v. Waddle, 427 F.3d 525, 537 (8th Cir. 2005) (Heartland II), aff'g 317 F. Supp. 2d 984 (E.D. Mo. 2004).

### 2.	Present Lawsuit for Damages

In 2006, Heartland sued the Officials in their individual capacities for monetary damages.[6] Counts I through VI are § 1983 claims. In Count I, the Students and Parents allege the Officials violated their Fourteenth Amendment rights to family integrity. In Count II, the Students allege the Officials violated their Fourth and Fourteenth Amendment rights to be free from unreasonable seizures. In Count III, the Students and Parents claim the Officials violated their First and Fourteenth Amendment rights to free association. In Count IV, the Students and Parents claim the Officials violated their First and Fourteenth Amendment rights to religious liberty and free speech. In Count V, Heartland claims certain Officials violated its First Amendment rights to freedom of association. In Count VI, Heartland claims certain

---

[6]The now-governing Second Amended Complaint states Heartland is suing the Officials in their official capacities for the purpose of seeking equitable relief, but Heartland has not sought equitable relief in this case.

Officials violated its First Amendment rights to free speech and religious freedom. Counts VII through IX are Missouri common law tort claims.[7]

The Officials moved for summary judgment, asking the district court to dismiss Counts I through VI on qualified immunity grounds and to decline to exercise supplemental jurisdiction over Counts VII through IX. After wading through an extensive record—the Officials' appendix on appeal is comprised of twelve volumes and nearly 3,000 pages—the district court held there were genuine issues of material fact precluding summary judgment with respect to Counts I, II, III, and V. The court dismissed Counts IV and VI but allowed the remaining counts to proceed to trial. The Officials appeal the denial of qualified immunity as to Counts I, II, III, and V.

## II. DISCUSSION
### A. Qualified Immunity: General Principles

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. ___, ___, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is not only a defense to liability but also an immunity from suit. Id. Because qualified immunity "is effectively lost if a case is erroneously permitted to go to trial," a district court order denying qualified immunity is immediately appealable under the collateral order exception to the final judgment rule "to the extent that it turns on an issue of law." Mitchell v. Forsyth, 472 U.S. 511, 526-27, 530 (1985).

---

[7]Heartland asserts Fourteenth Amendment procedural due process claims inhere in the Second Amended Complaint. It appears the district court agreed and declined to dismiss the due process claims on qualified immunity grounds. We consider the procedural due process claims in our analysis. Cf. Heartland II, 427 F.3d at 534 (holding procedural due process claims inhered in a similar pleading).

Inasmuch as we have jurisdiction, we review the district court's denial of qualified immunity de novo. See Nelson v. Corr. Med. Servs., 583 F.3d 522, 527 (8th Cir. 2009) (en banc) (citing Plemmons v. Roberts, 439 F.3d 818, 822 (8th Cir. 2006)). We consider two questions: (1) whether the plaintiff has shown the violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct. See Pearson, 129 S. Ct. at 815-16; Nelson, 583 F.3d at 528 (citation omitted).

We retain discretion to decide which of the two questions to answer first. See Pearson, 129 S. Ct. at 818; Nelson, 583 F.3d at 528. With respect to the first question, we view the summary judgment record in the light most favorable to the nonmoving party, Heartland, and afford Heartland "'all relevant inferences.'" Nelson, 583 F.3d at 527 (quoting Plemmons, 439 F.3d at 822). With respect to the second question, we evaluate "the 'objective legal reasonableness of the [alleged misconduct], assessed in light of the legal rules that were clearly established at the time it was taken.'" Pearson, 129 S. Ct. at 822 (quoting Wilson v. Layne, 526 U.S. 603, 614 (1999)). In other words, we seek the answer to the second question "'in light of the specific context of the case, not as a broad general proposition.'" Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)), overruled in part on other grounds by Pearson, 129 S. Ct. at 818.

## B.    The Officials' "I Didn't Do It!" Defenses
### 1.    Arguments

The Officials' primary argument on appeal is that the district court failed to assess their respective conduct individually when deciding whether they were entitled to qualified immunity. For example, the Officials point out the district court repeatedly referred to them "collectively as 'defendants.'" Various Officials then argue Heartland adduced insufficient evidence to demonstrate they participated in a conspiracy to harass and intimidate HCA. See Marti v. City of Maplewood, Mo., 57 F.3d 680, 685 (8th Cir. 1995) (citation omitted) (requiring a civil rights plaintiff

pressing a conspiracy claim to "show that two or more individuals conspired for the purpose of depriving [the plaintiff of a constitutional right] and that an act was done in furtherance of the conspiracy that caused an injury or deprivation").

Heartland rejoins we do not have jurisdiction over the Officials' primary argument because it is fact-intensive and does not turn on an issue of law. Cf. Mitchell, 472 U.S. at 530. Heartland opines the requirement to gauge an official's conduct individually is "[a]t most . . . *dictum*" and "practically speaking, is unenforceable in any interlocutory appeal of a denial of summary judgment on qualified immunity grounds." In the alternative, Heartland maintains there is sufficient evidence in the record to show all of the Officials participated in a conspiracy to violate the constitutional rights of the Heartland community.

### 2.    Duty to Evaluate the Officials' Conduct Individually

We do not quarrel with the Officials' premise that the district court was required to evaluate their conduct individually. Authorities not involved in the allegedly unconstitutional acts of their fellow public servants have not violated constitutional rights and are entitled to qualified immunity. See, e.g., Grayson v. Ross, 454 F.3d 802, 809-10 (8th Cir. 2006) ("[The defendant] was not involved in the decision to accept [the plaintiff] at the jail; therefore, he could not have violated [the plaintiff]'s constitutional rights based on [the plaintiff]'s intake and is entitled to qualified immunity for the intake."). "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." Wilson v. Northcutt, 441 F.3d 586, 591 (8th Cir. 2006) (citing Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005) (en banc)). Section 1983 does not sanction tort by association.

We believe we have jurisdiction over the narrow threshold question of whether the district court examined the Officials' conduct individually. See Northcutt, 441 F.3d at 591-92 (asserting jurisdiction, without discussion, for the purpose of

independently assessing each defendant's conduct). This threshold question asks only whether the district court properly applied the law. See Mitchell, 472 U.S. at 530 (holding jurisdiction exists when the denial of qualified immunity "turns on an issue of law"). This question does not, in itself, require us to resolve any disputed issues of evidentiary sufficiency. See Kahle v. Leonard, 477 F.3d 544, 549 (8th Cir. 2007) (reiterating "jurisdiction does not extend to issues of 'evidence sufficiency, i.e., which facts a party may, or may not, be able to prove at trial'" (quoting Johnson v. Jones, 515 U.S. 304, 313 (1995)).

After reviewing the district court's order, we do not agree with the Officials that the district court shirked its duty to gauge the Officials' conduct individually. Although the district court did not cite cases such as Northcutt, Doran, or Grayson, the court recognized qualified immunity is "to be applied to a particular defendant's conduct." The court expressly held "genuine issues of material fact exist with respect to the degree of each defendant's involvement in the mass removal."

The district court was not required to provide the Officials with an exhaustive written analysis of the merits of each claim as to each defendant. Cf. United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (stating district courts need not "'provide a mechanical recitation of the [18 U.S.C.] § 3553(a) factors when determining a sentence'" (quoting United States v. Walking Eagle, 553 F.3d 654, 659 (8th Cir. 2009)). See also Behrens v. Pelletier, 516 U.S. 299, 313 (1996) (remarking that the district court did not identify all the bases for its order denying qualified immunity and the "cumbersome review of the record to determine what facts the district court . . . likely assumed. . . . is the task . . . facing the Court of Appeals"). Time is a precious commodity for busy district court judges, and judicial opinions need not resemble law review articles.

### 3.    "I Didn't Do It!"

We lack jurisdiction over the Officials' arguments that Heartland adduced insufficient evidence to demonstrate various Officials participated in a conspiracy to harass and intimidate HCA.  These fact-intensive arguments amount to nothing more than prohibited "I didn't do it!" defenses.  See Johnson, 515 U.S. at 316-17, 319-20; Mueller v. Tinkham, 162 F.3d 999, 1004 (8th Cir. 1998).

In Johnson, the Supreme Court delineated the scope of the qualified immunity exception to the final order rule.  The Supreme Court cautioned that "considerations of delay, comparative expertise of trial and appellate courts, and wise use of appellate resources argue in favor of limiting interlocutory appeals of 'qualified immunity' matters to cases presenting more abstract issues of law." Johnson, 515 U.S. at 317. The Court held "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Id. at 319-20.  The Supreme Court made clear we must eschew fact-intensive "[W]e didn't do it!" defenses and confine appellate review to "neat abstract issues of law." Id. at 316-17 (citations omitted).[8]

In Mueller, a married couple brought a § 1983 action against two police detectives for conspiring to violate their Fourth and Fourteenth Amendment rights. Mueller, 162 F.3d at 1001-02.  The couple alleged the detectives applied for and executed a search warrant without probable cause. Id.  The district court denied the

---

[8]The neat abstract issue of law "typically" is whether the constitutional right at issue in the appeal was "clearly established" at the time of the alleged misconduct. See Behrens, 516 U.S. at 313; cf. Wilkie v. Robbins, 551 U.S. 537, 549 & n.4 (2007) (exercising jurisdiction to decide whether there is a federal constitutional tort action to challenge interference with property rights); Hartman v. Moore, 547 U.S. 250, 256-57 n.5 (2006) (exercising jurisdiction to review what elements a plaintiff needed to plead and prove to establish a First Amendment retaliation claim).

detectives' motion for summary judgment.  Id. at 1002.  Relying upon Johnson, we held we lacked jurisdiction to the extent the detectives argued the district court erred in finding a genuine issue of material fact as to whether the detectives actually conspired with one another to deprive the couple of their constitutional rights.  Id. at 1004 (citing Johnson, 515 U.S. at 313).

Other cases follow the teachings of Johnson and Mueller.  See, e.g., Pendleton v. St. Louis County, 178 F.3d 1007, 1010 (8th Cir. 1999) (dismissing appeal for want of jurisdiction to the extent the defendants argued "insufficient evidence links them to a conspiracy to retaliate against Plaintiffs for sending the fax").  Put simply, we lack jurisdiction when a defendant attempts to argue on appeal that he did not do what the civil rights plaintiff accuses him of doing.  See, e.g., Behrens, 516 U.S. at 313 (construing Johnson to hold there is no interlocutory appellate jurisdiction "if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred"); Brown v. Fortner, 518 F.3d 552, 557 (8th Cir. 2008) ("'[I]f the issues relate to whether the actor actually committed the act of which he is accused . . . or other similar matters that the plaintiff must prove, we have no jurisdiction to review them in an interlocutory appeal of a denial of a summary-judgment motion based on qualified immunity.'" (quoting Henderson v. Munn, 439 F.3d 497, 501 (8th Cir. 2006))); Kahle, 477 F.3d at 549 (same); Walker v. City of Pine Bluff, 414 F.3d 989, 991 (8th Cir. 2005) (similar).

In response to Heartland's jurisdictional challenge, the Officials try to couch their fact-intensive "I didn't do it!" defenses in the language of a purely legal argument.  The Officials characterize the issue before us as whether the evidence Heartland adduced is sufficient to survive scrutiny under Fed. R. Civ. P. 56.  The Officials stress they do not dispute Heartland's evidence, but only challenge its sufficiency to establish violations of clearly established constitutional rights.

We decline to elevate the form of the Officials' argument over its substance. See White v. McKinley, 519 F.3d 806, 813 (8th Cir. 2008) ("Even if a defendant frames an issue in terms of qualified immunity, we should determine whether he is simply arguing that the plaintiff offered insufficient evidence to create a material issue of fact." (citing Thomas v. Talley, 251 F.3d 743, 747 (8th Cir. 2001))). What matters is the gravamen of the Officials' argument, and here the Officials are each attempting to assert the "I didn't do it!" defense the Supreme Court declined to consider in Johnson and we declined to consider in Mueller. To entertain the Officials' arguments now would require us to conduct a highly fact-intensive analysis of the record at a relatively early juncture in the case.

We recognize the Supreme Court in Behrens reiterated "'a court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed'" because "Johnson permits [defendants] to claim on appeal that all of the conduct which the [d]istrict [c]ourt deemed sufficiently supported for purposes of summary judgment met the Harlow standard of 'objective legal reasonableness.'" Behrens, 516 U.S. at 313 (quoting Johnson, 515 U.S. at 319). The problem here is that the Officials ask us to do more than determine whether the conduct Heartland faults was objectively reasonable under the circumstances. The Officials maintain they did not participate in a conspiracy to harass or intimidate HCA.

The Supreme Court recently foreclosed the Officials' attempted end-run around Johnson. In Ashcroft v. Iqbal, 556 U.S. ___, ___, 129 S. Ct. 1937, 1947 (2009), the Court observed:

> In finding [the district court's order in Johnson] not a "final decision" . . . , the Johnson Court cited Mitchell for the proposition that only decisions turning "'on an issue of law'" are subject to immediate appeal. [Johnson, 515 U.S. at 313.] Though determining whether there is a genuine issue of material fact at summary judgment is a question of law,

-14-

it is a legal question that sits near the law-fact divide. Or as we said in Johnson, it is a "fact-related" legal inquiry. [Id. at 314.] To conduct it, a court of appeals may be required to consult a "vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials." [Id. at 316.] That process generally involves matters more within a district court's ken and may replicate inefficiently questions that will arise on appeal following final judgment. [Id.] Finding those concerns predominant, Johnson held that the collateral orders that are "final" under Mitchell turn on "abstract," rather than "fact-based," issues of law. [Id. at 317.]

We adhere to Johnson, Mueller, and Iqbal and hold we lack jurisdiction to entertain the Officials' "I didn't do it" defenses.

## C. Violations of Clearly Established Rights

We now turn to the remaining portion of the Officials' appeal and examine whether the Officials' alleged misconduct "'violated a clearly established constitutional or statutory right of which a reasonable person would have known.'" Littrell v. Franklin, 388 F.3d 578, 582 (8th Cir. 2004) (quoting Yowell v. Combs, 89 F.3d 542, 544 (8th Cir. 1996)); see also Manzano v. S.D. Dep't of Soc. Servs., 60 F.3d 505, 510 (8th Cir. 1995) (remarking that, in typical child abuse cases involving removal and the right to family integrity, "it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis"). We have jurisdiction over this portion of the Officials' appeal. See Kahle, 477 F.3d at 549 ("Although there is no interlocutory appellate jurisdiction to decide whether a particular defendant actually engaged in the conduct alleged . . . 'the reasonableness of [defendants'] actions in light of a known risk are all reviewable in an appeal of a denial of qualified immunity'") (quoting Miller v. Schoenen, 75 F.3d 1305, 1308 (8th Cir. 1996)).

The evidence Heartland presented to the district court—if believed—is so outrageous we are presented with a case in which the civil rights defendants acted in

a "plainly incompetent" manner or in "a knowing violation of a clearly established precedent." McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 (8th Cir. 2005) (citation and internal marks omitted). We express no view as to the ultimate truth. But under the version of the facts we must accept as true for purposes of this interlocutory appeal, the Officials knowingly worked with one another to effect the mass removal of HCA students without court orders, with court orders based upon lies, or court orders devoid of probable cause. The Officials deprived Heartland of notice and an opportunity to be heard, and then tried to cover up the Officials' wrongdoing—with false, misleading, and incomplete statements.

All of Heartland's relevant constitutional rights were clearly established on October 30, 2001. The state of the law on October 30, 2001, gave the Officials fair warning that effecting or at least conspiring to effect the mass removal of HCA students with bogus ex parte orders potentially would violate Heartland's Fourteenth Amendment rights to family integrity, Fourth and Fourteenth Amendment rights to be free from unreasonable seizures, First and Fourteenth Amendment rights to free association, and Fourteenth Amendment rights to procedural due process. The Supreme Court has long recognized the constitutional rights the Officials allegedly infringed. See, e.g., Chandler v. Miller, 520 U.S. 305, 308 (1997) (reiterating that warrantless seizures generally violate the Fourth Amendment absent an individualized reasonable suspicion determination); Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984) (recognizing a First Amendment "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends"); Lehr v. Robertson, 463 U.S. 248, 258 (1983) (stating "the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection" under the Fourteenth Amendment); Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 848 (1977) (construing the Fourteenth Amendment's due process clause to require a hearing "'[b]efore a person is deprived of a protected interest . . . except for extraordinary situations where some valid governmental interest is at stake that justifies postpone[ment]'" (quoting Bd. of Regents v. Roth, 408 U.S.

564, 570 n.7 (1972) (internal marks omitted)); Pierce v. Soc'y of Sisters, 268 U.S. 510, 535-36 (1925) (extending some Fourteenth Amendment liberty guarantees to private schools); Meyer v. Nebraska, 262 U.S. 390, 399 (1923) (construing the Fourteenth Amendment to protect "not merely freedom from bodily restraint but also the right of the individual . . . to acquire useful knowledge . . . to . . . bring up children, [and] to worship God according to the dictates of his own conscience"); see also Whisman ex rel. Whisman v. Rhinehart, 119 F.3d 1303, 1310 (8th Cir. 1997) (stating procedural due process in the context of child abuse investigations requires an adequate post-deprivation hearing); Thomason v. SCAN Volunteer Servs., Inc., 85 F.3d 1365, 1371-72, 1373 (8th Cir. 1996) (addressing whether the officials' disruption of familial relations was so disproportionate as to rise to the level of a constitutional deprivation and recognizing "the vital importance of curbing overzealous suspicion and intervention on the part of . . . government officials" when allegations of child abuse are made).

This is not a case in which it is undisputed the relevant authorities had a reasonable suspicion to suspect children were in imminent danger at the time of removal. Cf. Collins v. Bellinghausen, 153 F.3d 591, 596 (8th Cir. 1998) (asserting qualified immunity is appropriate to the extent the juvenile officer's "actions are properly founded upon a reasonable suspicion of child abuse"); Thomason, 85 F.3d at 1373 (holding a reasonable suspicion of life-threatening abuse of a child trumps a parent's Fourteenth Amendment right to family integrity). In making this legal determination, we reject the Officials' suggestion that various reports of child abuse at HCA justified their actions. Heartland alleges the Officials fabricated and exaggerated the reports of child abuse to suit the Officials' own ends. Cf. Thomason, 85 F.3d at 1371-72. Under Heartland's version of the facts, the Officials conspired to raid HCA even though they knew HCA posed no imminent threat of child abuse to HCA students. Heartland Corporations, for example, repeatedly attempted to work with the Officials and other relevant juvenile authorities to ensure the safety of HCA's students. Instead of accepting Heartland Corporations' voluntary and good-faith

gestures, the Officials used exaggerated, fabricated child abuse reports as a pretext for the raid.

Heartland did not present us with a pre-October 2001 case with identical facts. This is not dispositive. See, e.g., Hope v. Pelzer, 536 U.S. 730, 741 (2002) (announcing "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). The Supreme Court has observed, "[t]here has never been . . . a [§] 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages." United States v. Lanier, 520 U.S. 259, 271 (1997) (citation and internal marks omitted). "[T]he salient question . . . is whether the state of the law [on October 30, 2001] gave respondents fair warning that their alleged [misconduct] was unconstitutional." Hope, 536 U.S. at 741.

The Officials insist they did not have fair warning that conspiring to effect the mass removal of HCA students would violate Heartland's constitutional rights in part because state and federal law condoned their actions. See, e.g., Farid v. Smith, 850 F.2d 917, 923 (2d Cir. 1988). The Officials point out Missouri permits a juvenile officer to seize a child upon "reasonable cause to believe [the child] is without proper care, custody, or support and that temporary protective custody is necessary to prevent personal harm to the [child]." Mo. Sup. Ct. R. 111.01(a)(4). Missouri purportedly has a "sibling rule," which recognizes that abuse of one sibling is prima facie evidence of abuse of other siblings who reside in the same household. See, e.g., D.G.N. v. S.M., 691 S.W.2d 909, 911-12 (Mo. 1985) (en banc); cf. Myers v. Morris, 810 F.2d 1437, 1463 (8th Cir. 1987) ("If law enforcement personnel who have at least arguable probable cause to believe that adults have been molesting children are not entitled to reasonable belief that the adults may pose a danger to their own children, then the law was (and is) not clearly established on this point."), abrogated on other grounds by Burns v. Reed, 500 U.S. 478 (1991). The Officials note 42 U.S.C. § 5106a(b)(2)(A)(iii) required Missouri to "protect the safety of the abused or

-18-

neglected child and of any other child under the same care who may also be in danger of abuse or neglect and ensuring their placement in a safe environment."

The problem with the Officials' argument is that it presumes a view of the facts in the light most favorable to the Officials, not Heartland. Under Heartland's recitation of the facts, which this Court, for now, must accept as true, the Officials did not comply with Missouri or federal law; and the Officials worked together to seize HCA students even though all relevant available information indicated the students were not at immediate risk of child abuse or neglect. If we assume, for example, the sibling rule should apply with equal force in an institutional setting, the Officials did not have reasonable cause to believe temporary custody was necessary to prevent personal harm to all the juveniles the Officials seized. Indeed, four of the boarding students were not even juveniles. Mass removal arguably was not necessary because HCA had repeatedly expressed its willingness to work with DFS and had done so. Lesser measures, including measures that would have provided notice and a hearing to Heartland, were available to the Officials.

### D.    Offensive Collateral Estoppel

Heartland suggests the district court should have applied the doctrine of offensive collateral estoppel to preclude the Officials from asserting a qualified immunity defense. Heartland identifies that, in Heartland II, we affirmed the district court's holding that Waddle violated Heartland Corporations' Fourteenth Amendment rights to family integrity, Fourth and Fourteenth Amendment rights to be free from unreasonable seizures, and First and Fourteenth Amendment rights to free association. Because those same rights are at issue here, Heartland argues Heartland II conclusively establishes Waddle's liability for damages and is "persuasive" as to whether the other Officials are also liable. The district court declined to apply the offensive collateral estoppel doctrine. See also Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329 n.11 (1979) (noting commentators have expressed reservations about applying the offensive collateral estoppel doctrine).

"Offensive collateral estoppel is 'an attempt by a plaintiff to rely on a prior adjudication of an issue to prevent the defendant from challenging a fact necessary to the plaintiff's case and on which the plaintiff carries the burden of proof.'" Allstate Ins. Co. v. Blount, 491 F.3d 903, 912 n.9 (8th Cir. 2007) (quoting James v. Paul, 49 S.W.3d 678, 685 (Mo. 2001) (en banc)). A district court has "broad discretion" in deciding whether to apply the offensive collateral estoppel doctrine. See White Earth Band of Chippewa Indians v. Alexander, 683 F.2d 1129, 1134 (8th Cir. 1982) (citing Parklane Hosiery Co., 439 U.S. at 331). Because we do not disturb the district court's decision to deny the Officials' motion for summary judgment for the reasons set forth in Parts II.B and II.C above, at the present time we need not decide whether the district court abused its broad discretion in declining to apply the doctrine of offensive collateral estoppel.

## III. CONCLUSION

Where we have jurisdiction over the Officials' interlocutory appeal, the district court's order denying summary judgment is affirmed. We dismiss the remainder of the appeal for lack of jurisdiction. See Miller v. Schoenen, 75 F.3d 1305, 1311 (8th Cir. 1996).

_____